IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | |
|---|---|
| PRO-MECH USA, INC., Plaintiff, -vs- THE UNITED STATES, Defendant. | No. 03-1673C (Judge Braden) |

Washington, D.C.

Thursday, August 19, 2004

Deposition of

ROBERT J. CEBULA

a witness, called for examination by counsel on behalf of the Plaintiff, pursuant to notice, in the offices of The United States Department of Justice, Civil Division, 1100 L Street, Northwest, Washington, D.C., beginning at 10:06 a.m., before Daryl F. Garrett, a Verbatim Reporter and a Notary Public in and for the District of Columbia at Large, when there were present on behalf of the respective parties:

EXHIBIT 8

Whereupon,

ROBERT J. CEBULA

a witness, was called for examination by counsel on behalf of the Plaintiff, and, after having been duly sworn by the Notary Public, was examined and testified, as follows:

EXAMINATION ON BEHALF OF PLAINTIFF

BY MR. TOLCHIN:

Q Will you please state your full name?

A Robert John Cebula, that's C-e-b-u-l-a.

Q Mr. Cebula, what's your address, first work and then home?

A Okay. Work is Jamaica Plains, Boston Health Care System, Huntington Ave., Boston, New York or Boston, Massachusetts, 02130. My home is at 169 Nantasket, that's N-a-n-t-a-s-k-e-t, Apartment Number 9, and that is in Hull, H-u-l-l, Massachusetts, 02045.

Q Where are you employed?

A The VA Medical Center, Boston Health Care System.

Q What's your position there?

A I'm a contracting officer.

Q How long have you held that position?

A Three years.

journeyman; isn't that correct?
A That's correct.
Q In January, during a period of time, certainly by January, Phil Smith was working full time there; isn't that correct?
A That's correct.
Q He was what you call an un-licensed journeyman; isn't that correct?
A That's correct.
Q Because he had a license and he let it lapse; isn't that correct?
A That's correct.
Q Now, did you ever send a notice to Pro-Mech saying that having Mr. Smith there was unacceptable and that they had to replace him with somebody who had a license or any other notice, any e-mail, any --
A A written notice?
Q Any e-mail written notice, oral notice, anything to Pro-Mech saying that having Mr. Smith there was unacceptable because he didn't have a license.
A I'm sure we had verbal correspondence of that.
Q But nothing in writing; isn't that correct?
A Nothing in writing.

just didn't get it done; is that correct?

A That's correct, yeah.

Q Is there any provision in the contract that allows you to stop paying somebody because they couldn't get parts or they couldn't find a piece of equipment?

A Yes.

Q What provision of the contract allows you to do that?

A The provision that says that we will only pay for work that is completed.

Q Did you ever pay for any work that was completed in December?

A I don't believe so. If it was not on the invoice, we did not pay. If it was not invoiced, we did not pay other invoices, other --

Q Mr. Cebula, you just decided to stop paying and not tell Mr. Hannon why; isn't that correct? That was the decision you made.

A It's not that I told him why. If he didn't know why, he wasn't doing his job.

Q So you stopped paying and you decided not to tell him why because you figured he had to figure it out himself; isn't that right?

A He's the manager of Pro-Mech, the president of Pro-Mech.

Q Answer the question yes or no, Mr. Cebula.

A Yes.

Q You never defaulted Pro-Mech, did you?

A Pro-Mech left on their own accord.

Q Pro-Mech left because you refused to pay them; isn't that correct, and refused to tell them why?

MR. COLT: Objection. I don't know if Mr. Cebula can say why Pro-Mech left.

MR. TOLCHIN: Fair. I'll withdraw the question.

BY MR. TOLCHIN:

Q So just to be clear, you permitted Pro-Mech to have people on the job in December, from November 15, through December 15, from December 15, through January 15, January to February, February to March and all the way to April 1? You permitted Pro-Mech to have people on the job there; isn't that correct? You didn't kick them off the job?

A No.

Q So you permitted them to have people there on the job?

A We let them have people there on the job, yes.
Q So you allowed them to proceed with the contract; isn't that correct?
A Yes.
Q During that period of time you accepted whatever work that they did?
A Not fully accepted, as you will see on the April 4, out of the 1,117 orders that we gave them, 641 were completed, which is half, 50 percent.
Q You never sent a notice of rejection, did you? November to December, December to January, January to February, February to March, all the way to April 1, you never sent a notice of rejection, did you?
A Again, Pro-Mech -- I did not --
Q Just answer the question, Mr. Cebula.
A No, no.
Q You never sent a notice of rejection?
A I don't believe I have.
Q Whether there's a dispute as to whether they did this work or didn't do the work, whatever work that they did do, you received the benefit of that work; isn't that true?
A That's correct.

DEPARTMENT OF VETERANS AFFAIRS

February 19, 2003

Martin F. Hannon, President
PRO-MECH USA
122 Railroad Drive
Ivyland, PA 18974

In Reply Refer To:

SUBJECT: SHOW/CAUSE NOTICE, Contract #V523P-7085, Provide HVAC Maintenance Services at VA Boston Healthcare, Jamaica Plain Campus

Dear Mr. Hannon:

After approximately six months that the subject contract has been in effect, Pro-Mech USA Inc. (Pro-Mech) has not fulfilled the requirements stated in the subject contract with the Boston Healthcare System, Jamaica Plain Campus (VAMC Veterans Administration Medical Center). The following are those contract requirements which have not been fulfilled. Furthermore, a huge concern of the VAMC is that no attempt has ever been made to correct these deficiencies from the first day the contract was in effect.

**PRE-AWARD**

The assessment of the equipment before Pro-Mech submitted a proposal was done during a four hour walk through by Richard Jensen of Pro-Mech and a representative of VAMC A complete assessment of the equipment was never made between proposal issue date of June 6, 2002 and the closing date of July 26, 2002. The following statements are found in the Pro-Mech technical proposal, which was used by the VAMC to evaluate and award the contract to Pro-Mech. This technical proposal and any other correspondence that was used to evaluate Pro-Mech the purpose of award is now part of the contract based on FAR Clause 52.212-2 Evaluation - Commercial Items (Jan 1999)

<u>1. Richard Jensen signed letter of July 26, 2002</u>

a. " Pro-Mech can not only save VAMC a lot of money but Pro-Mech will also vastly improve the services the VAMC should expect and receive for this contract". To date, there have been no recommendations made to VAMC as to how or when these savings are going to be realized.

b. "Mechanical rooms and equipment need and will receive immediate cleanup and trash removal servicing. This was in response to cleanup specifically addressed in Modification #2 to the Solicitation. The mechanical rooms have not been cleaned since the contract began.



EXHIBIT
tabbles
9

c. "Insulation is missing on a lot of pipes and pumps causing loss of energy and sweating of pipes." There has been nothing done to correct this problem.

d. " Safety concerns were also found with belt guards left off of compressors ". This problem has also not been corrected.

e. "Pro-Mech will give VAMC staff weekly status reports of all equipment and Pro-Mech will document **ALL SERVICE CALLS, PM'S AND WORK ORDERS."** Pro-Mech has been submitting monthly PM's, however, Pro-Mech has not responded to service calls or wok order requests. There are approximately 80 work order requests outstanding.

2. Management Plan and Contract Management

a. "Pro-Mech believes it is in the best interest of the customer to maintain assigned personnel who have been at the site previously, when available for hire, and who are familiar with the buildings and the HVAC Equipment and the history of service work performed. **THESE MECHANICS WILL BE DISPATCHED TO THE SERVICE CALL WITH COMMONLY USED SPARE PARTS AND TOOLS NEEDED TO PERFORM MOST REPAIRS AND PREVENTIVE MAINTENANCE TASKS".** The personnel assigned to this contract were hired after contract date. This issue was discussed at length at each one of the pre-award meetings. and the VAMC was assured that employees who would be assigned to this contract were full time employees of Pro Mech. The experience of those HVAC Mechanics shown on their resumes which were provided, showed that these employees were much more qualified than those employees currently manning the site. Moreover, none of current employees were on site during the phase in period. Furthermore, some spare parts, including filters, belts and tools have been provided to Pro-Mech by the VAMC.

b. " For Emergency situations other Pro-Mech Mechanics are also available on site within on hour or when needed". VAMC has not received the current organization chart and the resumes of the people that are now assigned to this project. Letter of September 9, 2002 is now obsolete and has to be updated with the personnel telephone number including cell numbers and fax numbers.

c. "To operate each piece of equipment to make patients, staff and occupants safe and comfortable". Repeated trouble calls for no heat in Building #1 and Building #9 have put patients and employees in difficult environments. As explained in a fax forwarded by VAMC on January 10, 2003, concerning the condition of Building 1A, the safety of our employees has already been comprised.

d. "In conjunction with Employee Training, Quality Control Plan and Preventive Maintenance Plan Pro-Mech will follow up random **SERVICE CALLS.** Each of these elements is essential to providing our customers with the services they expect and are paying for". None of the above Plans have been submitted to VAMC for approval.

e. "**SERVICE TICKETS AND WORK ORDERS** will also be entered into Pro-Mech Data Stream Program". Pro-Mech will give a copy of each **WORK ORDER** to Engineering". There has been no evidence of a Data Stream Program. The VAMC has never received any Pro-Mech generated data. In fact, Pro-Mech site office does not have electronic data processing capabilities.

3. Safety and Environmental Data

a. "All Pro-Mech employees will receive safety training at monthly meetings". VMAC has not received a Safety Plan, nor has received signed attendance sheets of any employees that had safety training.

4. Technical Capabilities

a. " Pro-Mech will provide at no additional costs the services of our Professional Engineers when needed. Pro-Mech will staff the Boston Veterans Hospital with licensed and trained HVAC Mechanics **WITH NEEDED TOOLS, PARTS, MANUALS AND SUPPLIES NEEDED TO SATISFACTORILY PERFORM THIS CONTRACT."** There were no licensed HVAC Mechanics on site during the period of October 01, 2002 thru October 08, 2002. Phil Smith who was the on-site supervisor during October and November is not a licensed HVAC mechanic.

5. Contractor Responsibility

a. " Pro-Mech has available a $250,000 line of credit SBA Loan with Progress Bank in Warrington, PA. Additionally, Pro-Mech has established over $100,000 of credit with its major suppliers". It's been known for some time that Pro-Mech employees were given VAMC material and tools and now have to request from the home office approval to order parts.

b. " to better support your needs Pro- Mech plans to open an office this year in Dedham, MA". As you are aware, no such office has been opened. Furthermore, the VAMC site office is being used for other than contractual business

6. Organizational Support

a. Resumes submitted showed that five Pro-Mech employees would be thoroughly familiar with the contract requirements and could be called to VAMC in case of an emergency. These personnel have a total combined experience of approximately 60 years. During the post award start up period, or at no time, were these five Pro-Mech employees familiarizing themselves with the requirements of the contract. The employees assigned to this contract and total combined experience is well below the number of employees and the total combined experience level that was included in the Pro-Mech technical proposal.