# Appendix

Index to Appendix:


| | |
|---|---|
| Exhibit 1 | Daniel Willis Deposition Transcript Sections |
| Exhibit 2 | Contracting Officer's February 19, 2003 Show Cause Notice |
| Exhibit 3 | Text of 31 U.S.C. § 3903 |
| Exhibit 4 | Affidavit of Norbert J. Cebula |
| Exhibit 5 | Norbert J. Cebula Deposition Transcript Sections |
| Exhibit 6 | Thomas R. Loos Deposition Transcript Sections |
| Exhibit 7 | Joseph E. Hoffman Deposition Transcript Sections |
| Exhibit 8 | Legal Advice letter regarding Pro-Mech's contract responsibilities |

# Defendant's Exhibit 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

\- - - - - - - - - - x

PRO-MECH USA, INC., :

Plaintiff, :

-vs- : No. 03-1673C
(Judge Braden)

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - x

Washington, D.C.

Thursday, August 19, 2004

Deposition of

DANIEL WILLIS

a witness, called for examination by counsel on behalf of the Plaintiff, pursuant to notice, in the offices of The United States Department of Justice, Civil Division, 1100 L Street, Northwest, Washington, D.C., beginning at 12:00 p.m., before Daryl F. Garrett, a Verbatim Reporter and a Notary Public in and for the District of Columbia at Large, when there were present on behalf of the respective parties:

Whereupon,

DANIEL WILLIS

a witness, was called for examination by counsel on behalf of the Plaintiff, and, after having been duly sworn by the Notary Public, was examined and testified, as follows:

EXAMINATION ON BEHALF OF PLAINTIFF

BY MR. TOLCHIN:

Q State your name, please?
A Daniel Willis.
Q Mr. Willis, where do you work?
A I work for the VA Boston Health Care System, Jamaica Plain campus.
Q The address there is what?
A 150 South Huntington Ave., Boston.
Q How long have you worked there?
A I've been at that facility for four years.
Q Where do you live?
A I live in Franklin, Massachusetts.
Q Your address there?
A 11 Regent Circle, Franklin, Mass.
Q What's the zip code there?
A 02038.
Q Mr. Willis, you say you've been employed for

Q Didn't you submit your resignation when they let Mr. Smith back on to the campus?

A I don't recall.

MR. COLT: One thing to clarify for the record, the contracting officer, technical representative, is that what Mr. Tolchin is referring to?

THE WITNESS: Yes.

MR. TOLCHIN: The COTR.

THE WITNESS: Yeah. I don't recall in -- it's possible I may have, but I don't recall it.

BY MR. TOLCHIN:

Q You never really quit though, you stayed on --

A Yes.

Q -- as COTR?

A It's not a job I can really quit.

Q You stayed on as COTR the whole time?

A I believe so.

Q You didn't get along with Mr. Smith, did you?

A I got along with him very well initially.

Q Did you get into a fight with him?

A No.

Q Did you ever have the police called because of him?

A I had -- there was an incident with one of my mechanics.

Q Who is that?

A Mr. Tom Loos.

Q Were you involved in that incident?

A No. I was called by the VA police.

Q What happened?

A They told me that this incident had occurred.

Q What did the police finally conclude?

A I believe they --

Q I'm sorry?

A I don't recall.

Q They closed the investigation because they found there was no incident; isn't that right?

A I would have to review the report.

Q But whatever the report says, you would say that's what happened; is that right? You have no reason to doubt --

A I have no reason. I wasn't present, so --

Q Did you ever advise Mr. Cebula to either pay or not to pay Pro-Mech?

A Yes.

Q What did you advise him?

A When the invoices were presented to the contracting people, they would ask me if it was okay to pay for the services that were being claimed.

Q So you told Mr. Cebula that's not okay to pay?

A Right.

Q When did you tell him that first?

A I believe in November after the -- I believe sometime in November for the November invoices.

Q Why did you tell him that it was not okay to pay?

A Because the contractor wasn't performing the maintenance as required.

Q What was the contractor not doing?

A He was not doing anything basically.

Q What was the contractor not doing?

A He was not performing any repair, maintenance, testing, lubricating, changing of filters, anything that was required under the scope of work of the contract.

Q How do you know he wasn't doing it?

A Because whenever they were to report back to me with the tasking sheets, the tasking sheets mostly were coming back blank or I was being told by Mr. Smith that, you know, he didn't have to do the work because it wasn't

covered in the contract.

Q What was he telling you wasn't covered?

A Just about everything.

Q Did he tell you that preventive maintenance wasn't covered?

A Right. It was basically just about anything that came up. And for the most part, whenever I would go down to the area that was assigned to them for office purposes, I usually -- anytime of the day I would find them all sitting there not doing any work.

Q Did you ever write up reports to Mr. Cebula about them not doing any work?

A I believe I did send a few e-mails about that.

Q Those e-mails were all produced to us; is that right?

A Yes.

Q Did you ever advise Pro-Mech that they weren't being paid because they're not doing any work?

A Yes. I probably said something to them, yes.

Q Who did you say it to?

A Probably Mr. Smith.

Q When did you tell him that?

A Sometime probably in November when he had

questioned me about the invoices.

Q What precisely did you tell him?

A I told him -- I would tell him that -- I would have told him, at the time, that the invoice wasn't being paid because of non-performance and whether there was specific things that had happened or just overall performance.

Q Do you know whether Mr. Cebula ever sent a cure notice?

A Yes.

Q But he didn't send a cure notice till February; is that correct?

A I believe so.

Q So what happened in November, December, January and until mid-February? Why wasn't a cure notice sent then?

A We were continuing to try to work with the contractor to get resolution.

Q By not paying them?

A No. I -- well, we're the government. We cannot pay for services that we don't get. If the contractor doesn't do something and they don't provide the service, how can we pay them for it?

showing you a page of what's -- what is page 338 of the documents you produced to us, which is a February 14, e-mail. It's from you and it says you quit as COTR because Mr. Smith has come back.

Do you see that there?

(Mr. Tolchin handed a document to the witness for his examination.)

A Yeah.

Q Did you withdraw that resignation?

A I believe I did.

Q Why were you quitting because Mr. Smith was back?

A I was pretty frustrated with this whole situation.

Q With what situation?

A With the whole contract situation and the lack of performance by Pro-Mech. Mr. Smith, after his being in the area for a couple of weeks, made a trip to Pennsylvania, came back. He seemed to have a whole new outlook on life and the contract.

And proceeded to tell me that this is the way the contract is and not what I thought it was to be or what the documents said it was.

Q Did you have any hand in writing the contract?
A Only in the scope of work.
Q Did you write any parts of the scope of work?
A We formed a team and wrote the scope of work.
Q Did you understand the scope of work to require that major replacements be done by Pro-Mech?
A What do you mean by major replacements?
Q Let me withdraw that.
You understood that this was a preventive maintenance contract; isn't that correct?
A No. I understood this to be a professional maintenance and service contract.
Q So you wanted Pro-Mech, under this contract, to replace components and pieces of equipment that were broken, is that correct, at a fixed rate?
A As was indicated by the scope of work.
Q Is that your understanding?
A Right.
Q So if an HVAC system broke, you expected them to replace the HVAC system?
A No. I expected them to repair it.
Q Well, if it couldn't be repaired, you expected them to replace it?

A Depending on the equipment.

Q How would they know whether it was something that had to be replaced or not replaced?

A Well, then that was something we would discuss. If they had a dispute on anything, then they were to come to me, we would talk about it. If it was determined that it would be something that was outside of the scope of the contract between myself, the contracting officer and the contractor, then they would come to agreement with the contracting officer.

Q What was your definition of what was within the scope and what was outside the scope?

A Motors, a fan motor burns out, that's within the scope of the work.

Q How did you know that?

A How would I know that?

Q Yeah.

A It's in the scope of work.

Q Show me in the contract what it is you're referring to? You'll have to use this one because it's the only complete one.

(The witness examined a document.

A I think it's paragraph seven.

Q I'm showing you the scope of work beginning on page 8 of 47.

(Mr. Tolchin handed a document to the witness for his examination.)

MR. COLT: For the record, this is Bates number 86 of the Plaintiff's document production.

THE WITNESS: Page 9 of 47, paragraph seven.

BY MR. TOLCHIN:

Q How do you interpret that clause?

A I interpret it just as it states, that if they discover anything wrong with this equipment during the testing, inspection, maintenance of that equipment, that they shall, and it's bolded, "repair or remove and replace the worn components and/or parts."

Q You identify components and/or parts to mean the entire piece of equipment, if necessary?

A No.

Q Only pieces of the equipment?

A Parts of it.

Q So if a compressor broke, would the compressor have to be replaced?

A Right.

Q The entire compressor?

A The compressor is a part of the unit.

Q How much is a compressor for one of these big HVAC units cost, approximately?

A It can be -- they could be $100, they could be --

Q Ten thousand?

A Not that much, but, you know, several thousands --

Q Several thousands of dollars. So if they --

A That would be only on one of the largest pieces of equipment we have.

Q So if a $5,000 compressor broke, you would require -- under this contract, you would think that Pro-Mech would have to pay for that?

A Correct.

Q Lots of the equipment there was old equipment; isn't that right?

A Yeah, it was a fairly mixed up bag.

Q So even if an old compressor broke, you would require them to replace it; is that right?

A Correct.

Q And you knew that Phil Smith had told you that this wasn't his company's interpretation of the contract;