isn't that right?

A That was what Mr. Smith came back with after his trip to Pennsylvania or wherever he went.

Q That's when you and he began butting heads; is that correct?

A Correct. We were in disagreement.

Q That's when you and he started getting into arguments; isn't that right?

A Well, we didn't get into arguments. I mean, it was more or less that I would say, you know, "We need to get this repaired." You know, "It's covered in the contract." And he would say, "No, it's not." And he would become, you know, pretty upset about it and then when I would take the scope of work and point it out to him -- okay.

For instance, thermostats, and we had some problems with some fan coil unit's thermostats over in our Building 9. I told him, you know, "Phil, you need to take care of that," you know, "It's part of the contract." And he said, "It's not, it's not part of the contract." Over the radio in the clear he said this.

So I said, well, come on down and see me and we'll talk about it. He came down, sat down, I went over

thermostats. So that was the kind of problems we were having.

Q So it was based upon those problems that you recommended that Pro-Mech not be paid; is that correct?

A Based on their performance. They were not doing the work and no materials coming in for them to even attempt to do the work.

Q The work that they weren't doing was this kind of work that there was a dispute as to whether it was covered or not?

A No. They were not doing the preventive maintenance work.

Q But you have no documentation of that; is that correct?

A I have these documents that are in this -- that tell me whether the -- the past.

Q That's the documents from your printout, you don't have the basic documents, do you?

A Not currently in my possession, no.

Q Now, do you know why Mr. Cebula didn't send a cure notice until February?

A No.

Q Did he tell you why he hadn't sent a cure

Q Did he tell you why he hadn't sent a cure notice?

A When I would speak with Mr. Cebula about the performance, he would tell me that -- he told me that direction from his superior was that we were to help the contractor as much as possible.

Q Who was his superior?

A Marian Leblanc.

Q Did you talk to him about responding to the letter that he received, responding to his cure notice?

A I don't understand the question.

Q Were you involved with crafting a response to the answer to the cure notice?

A I don't believe so.

Q I'm going to show you a document and ask you whether you know who wrote it. I show you a copy of what begins on page 234, the documents you produced to us. Is that a document that you prepared or participated in the preparation of? It begins on page 234 and it goes on.

(Mr. Tolchin handed the document to the witness for his examination.)

A No.

Q Do you know who prepared that document?

# Defendant's Exhibit 2

DEPARTMENT OF VETERANS AFFAIRS

February 19, 2003

Martin F. Hannon, President
PRO-MECH USA
122 Railroad Drive
Ivyland, PA 18974

In Reply Refer To:

SUBJECT: SHOW/CAUSE NOTICE, Contract #V523P-7085, Provide HVAC Maintenance Services at VA Boston Healthcare, Jamaica Plain Campus

Dear Mr. Hannon:

After approximately six months that the subject contract has been in effect, Pro-Mech USA Inc. (Pro-Mech) has not fulfilled the requirements stated in the subject contract with the Boston Healthcare System, Jamaica Plain Campus (VAMC Veterans Administration Medical Center). The following are those contract requirements which have not been fulfilled. Furthermore, a huge concern of the VAMC is that no attempt has ever been made to correct these deficiencies from the first day the contract was in effect.

**PRE-AWARD**

The assessment of the equipment before Pro-Mech submitted a proposal was done during a four hour walk through by Richard Jensen of Pro-Mech and a representative of VAMC A complete assessment of the equipment was never made between proposal issue date of June 6, 2002 and the closing date of July 26, 2002. The following statements are found in the Pro-Mech technical proposal, which was used by the VAMC to evaluate and award the contract to Pro-Mech. This technical proposal and any other correspondence that was used to evaluate Pro-Mech the purpose of award is now part of the contract based on FAR Clause 52.212-2 Evaluation - Commercial Items (Jan 1999)

1. Richard Jensen signed letter of July 26, 2002

a. " Pro-Mech can not only save VAMC a lot of money but Pro-Mech will also vastly improve the services the VAMC should expect and receive for this contract". To date, there have been no recommendations made to VAMC as to how or when these savings are going to be realized.

b. "Mechanical rooms and equipment need and will receive immediate cleanup and trash removal servicing. This was in response to cleanup specifically addressed in Modification #2 to the Solicitation. The mechanical rooms have not been cleaned since the contract began.

c. "Insulation is missing on a lot of pipes and pumps causing loss of energy and sweating of pipes." There has been nothing done to correct this problem.

d. " Safety concerns were also found with belt guards left off of compressors ". This problem has also not been corrected.

e. "Pro-Mech will give VAMC staff weekly status reports of all equipment and Pro-Mech will document **ALL SERVICE CALLS, PM'S AND WORK ORDERS."** Pro-Mech has been submitting monthly PM's, however, Pro-Mech has not responded to service calls or wok order requests. There are approximately 80 work order requests outstanding.

2. Management Plan and Contract Management

a. "Pro-Mech believes it is in the best interest of the customer to maintain assigned personnel who have been at the site previously, when available for hire, and who are familiar with the buildings and the HVAC Equipment and the history of service work performed. **THESE MECHANICS WILL BE DISPATCHED TO THE SERVICE CALL WITH COMMONLY USED SPARE PARTS AND TOOLS NEEDED TO PERFORM MOST REPAIRS AND PREVENTIVE MAINTENANCE TASKS".** The personnel assigned to this contract were hired after contract date. This issue was discussed at length at each one of the pre-award meetings. and the VAMC was assured that employees who would be assigned to this contract were full time employees of Pro Mech. The experience of those HVAC Mechanics shown on their resumes which were provided, showed that these employees were much more qualified than those employees currently manning the site. Moreover, none of current employees were on site during the phase in period. Furthermore, some spare parts, including filters, belts and tools have been provided to Pro-Mech by the VAMC.

b. " For Emergency situations other Pro-Mech Mechanics are also available on site within on hour or when needed". VAMC has not received the current organization chart and the resumes of the people that are now assigned to this project. Letter of September 9, 2002 is now obsolete and has to be updated with the personnel telephone number including cell numbers and fax numbers.

c. "To operate each piece of equipment to make patients, staff and occupants safe and comfortable". Repeated trouble calls for no heat in Building #1 and Building #9 have put patients and employees in difficult environments. As explained in a fax forwarded by VAMC on January 10, 2003, concerning the condition of Building 1A, the safety of our employees has already been comprised.

d. "In conjunction with Employee Training, Quality Control Plan and Preventive Maintenance Plan Pro-Mech will follow up random **SERVICE CALLS.** Each of these elements is essential to providing our customers with the services they expect and are paying for". None of the above Plans have been submitted to VAMC for approval.

e. "**SERVICE TICKETS AND WORK ORDERS** will also be entered into Pro-Mech Data Stream Program". Pro-Mech will give a copy of each **WORK ORDER** to Engineering". There has been no evidence of a Data Stream Program. The VAMC has never received any Pro-Mech generated data. In fact, Pro-Mech site office does not have electronic data processing capabilities.

3. Safety and Environmental Data

a. "All Pro-Mech employees will receive safety training at monthly meetings". VMAC has not received a Safety Plan, nor has received signed attendance sheets of any employees that had safety training.

4. Technical Capabilities

a. " Pro-Mech will provide at no additional costs the services of our Professional Engineers when needed. Pro-Mech will staff the Boston Veterans Hospital with licensed and trained HVAC Mechanics **WITH NEEDED TOOLS, PARTS, MANUALS AND SUPPLIES NEEDED TO SATISFACTORILY PERFORM THIS CONTRACT."** There were no licensed HVAC Mechanics on site during the period of October 01, 2002 thru October 08, 2002. Phil Smith who was the on-site supervisor during October and November is not a licensed HVAC mechanic.

5. Contractor Responsibility

a. " Pro-Mech has available a $250,000 line of credit SBA Loan with Progress Bank in Warrington, PA. Additionally, Pro-Mech has established over $100,000 of credit with its major suppliers". It's been known for some time that Pro-Mech employees were given VAMC material and tools and now have to request from the home office approval to order parts.

b. " to better support your needs Pro- Mech plans to open an office this year in Dedham, MA". As you are aware, no such office has been opened. Furthermore, the VAMC site office is being used for other than contractual business

6. Organizational Support

a. Resumes submitted showed that five Pro-Mech employees would be thoroughly familiar with the contract requirements and could be called to VAMC in case of an emergency. These personnel have a total combined experience of approximately 60 years. During the post award start up period, or at no time, were these five Pro-Mech employees familiarizing themselves with the requirements of the contract. The employees assigned to this contract and total combined experience is well below the number of employees and the total combined experience level that was included in the Pro-Mech technical proposal.

7. Best and Final Offer

a. Pro-Mech letter dated August 26, 2002 " Pro-Mech is able to achieve this price reduction without reducing our commitment of manpower, tools, and **QUALITY MATERIALS** required to perform this contract. Make no mistake, VAMC will not entertain an increase in contract price.

**POST WARD**

1. Phase in Period

a. This contract commenced on September 15, 2002 to give Pro-Mech an opportunity to familiarize the contractor with the contract requirements. During that time frame, it was an opportunity to order materials and supplies and to transport equipment and tools. More importantly, it was an opportunity to gain valuable information from the incumbent contractor, Limbach Mechanical Contractors, who remained on site until September 30, 2002. For 15 days only one licensed journeyman and one apprentice took advantage of this opportunity. Pro-Mech PM Sheets show that there are approximately 50 pieces of equipment that Pro-Mech can not find. Furthermore, there are 3 roofs, each containing large pieces of equipment, which Pro-Mech can not find

2. Contract Requirements

a. When the incumbent Contractor left on September 30, 2002 it was Pro-Mech responsibility to fully man the contract. On October 1, October 2, and October 3, and for the holiday week end, only one apprentice was present. This was grounds for an immediate Termination for Default. Conversation and correspondence gave the impression that one journeyman was sick and the plan to have a replacement could not be accomplished. In conversation with Pro- Mech employees and other sources confirmed that the above excuses were lies.

b. Paragraph #1 of the Contract states "furnish all labor, **MATERIALS,** equipment and supervision required for the professional maintenance of building environmental systems listed in the attached Inventory of Equipment. It was the responsibility of Pro-Mech to determine the status of each piece of equipment on the Inventory of Equipment. It was never Pro-Mech responsibility to upgrade the systems above the performance that existed at the contract commencement date. It was discussed at the pre bid meeting that some of this equipment could be approximately 50 years old the Government did not expect the Pro-Mech to upgrade the system beyond the condition it was turned over to Pro-Mech. What the VAMC did expect is that the systems would be maintained to keep them running.

No were does this imply that Pro-Mech is responsible for only the equipment that it had done preventive maintenance on. Pro-Mech assumed responsibility for all the equipment

shown on the Inventory of Equipment the date the contract was signed. It makes sense that only a small portion of the Inventory of Equipment is PM everyday. Given that scenario, it would take months for Pro-Mech to assume responsibility for the entire list.

c. Paragraph #7 of the Contract states "If items are discovered during testing, inspection, and maintenance phases of this project, the Contractor shall **REPAIR OR REMOVE AND REPLACE WORN OR DOUBTFUL COMPONENTS AND/OR PARTS. THE CONTRACTOR, SHALL PROVIDE COMPONENTS, PARTS AND SUPPLIES REQUIRED TO KEEP THE EQUIPMENT OPERATING PROPERLY AND EFFICIENTLY AT NO ADDITIONAL COST TO THE GOVERNMENT"**

d. Paragraph #8 of the Contract reads "In the event that components or repairs fail because of lack of knowledge or improper workmanship, the **CONTRACTOR SHALL MAKE WHATEVER REPAIRS** are necessary in order to bring the equipment to the proper operating state at no cost to the Government. Any damages will be borne by the Contractor.

e. Paragraph #15 of the Contract reads " Subsequent to award of this contract, Pro-Mech shall provide to the VAMC unit price for each item listed in the Inventory of Equipment. The prices of each individual item shall equal the annual contract amount." To date, VAMC has not received these unit prices.

f. Paragraph #18 of the Contract reads "The Contractor shall allow for unscheduled work resulting from "abnormal conditions". The Contractor shall include 200 man hours in the annual price. The hourly rate for "Emergency Services" included in the "Supplies or Services and Prices/Cost is $52.00 per hour not the $75.00 shown on Additional Work Authorization submitted to VAMC.

g. Paragraph C of the contract under the title of "Selection Criteria" states that " The Contractor shall have engaged in the task of providing HVAC maintenance activities as a major part of their normal business for a period of at least five years. The key word here is CONTRACTOR. According to Pennsylvania Department of State, Pro-Mech USA, Inc. filed for incorporation on May 17, 2002.

h. Refrigerant Management Program

VAMC has not received a copy of Pro-Mech USA Refrigerant Management Program, nor copies of licenses held by Pro-Mech employees who have had this training.

i. Pro-Mech USA has not provided an Equipment Maintenance Schedule as was part of the technical proposal.

j. Several detailed Monthly PM's show several pieces of equipment as being 100% complete. This equipment was not 100% maintained since parts ordered to perform this function arrived after the sheets were turned in.

**OTHER**

a. Letter dated September 25, 2002 Pro-Mech USA stated that it had lost those employees due to pressure from an Union Official. VAMC understands that Union Officials can be threatening. To say that this short conversation was enough to scare off two experienced workers from leaving an employer who had five years of work under contract is suspicious. The only area of concern was that the Union Official was trespassing on federal property. This situation was reported by Dan Willis to the VAMC Police as soon as he became aware of it. Dan Willis and Larry Cummings met with the VAMC Police and the VAMC Police informed the Union Official not to engage in this activity on VAMC property

b. There will no response to the **unsigned** letter of December 5, 2002 written by the Law Offices of Robert P. Meingossner.

**RE - PROCUREMENT**

Based on the fact that the HVAC system is a very critical part of the VAMC operations, the following services were, or will be, re-procured and costs will be charged to Pro-Mech account

a. 10/10/2002 - Chiller Bldg.

Condenser water blow down solenoid 400 Ton Trane Tower

b. 10/27/2002 - Bldg #1- 12B Mechanical Room

Return airflow missing wiring from control coils

c. 10/29/2002 - Bldg. #2 - Basement (Invoiced as Extra Work)

Traced and repaired pneumatic leaks in lines

d. 11/12/2002 - Bldg. #1 - 3rd floor (Invoiced as Extra Work)

Installed control valve body and traced out control wiring

e. 11/22/2002 - Bldg.# 7 (Invoiced as Extra Work)

Revised control circuit to operate both compressors at the same time when tank pressure drops

f. 12/11/02

Hot water valve/actuator needs to be replaced Doctors lounge ACA building. Pro-Mech has this part and refuses to replace it unless they are paid to do so .This item is covered in the HVAC contract.

g. 12/13/2002- Bldg#9 (Done by Others)

VFD for Pump #2. Pro-Mech denies this is covered equipment and will not repair it under the terms of the contract.

h. 1/29/2003 - Bldg# 2- Linear Accelerator (Done by Others)

Chiller which provides cooling for Linear Accelerator. Nearly sent patients home and cancel treatment Replace low water temperature control.

i. 1/30/2003 Bldg #4 (Invoiced as Extra)

Modular master heat pump blower motor and capacitor replaced. Building# 9 replaced 5 thermostats on fan coil units

j. 2/4/2003 - Bldg #1, 4th Floor (Done by Others)

Replaced fan motor, contactor, overload, pulley and sheeves and auxiliary contactor due to fire caused by excessive grease at the vent slots of he end bell and this grease was very dusty and excessive run time

k. Latest Pro-Mech PM sheets show that approximately 15 units need thermostats. These will be Done By Others.

SUMMARY

a. In summary, as stated above Pro-Mech has not met contractual requirement for the past six months. This unquestionably shows that VAMC has given Pro-Mech ample amount of time to correct any violations. The fact that Pro Mech has been waiting for a "list of violations" shows that Pro-Mech does not understand the contract requirements. All statements made above are direct quotes taken from the contract. One, two, or three of the above items would not be considered significant. However, the total number of items that are stated above which do not conform to the contract is significant. As you will note, parts of this letter are written in **capitalized bold print** to point out the contract requirements include supplying parts, making repairs and responding to service calls. This should resolve the argument that this contract is only for preventive maintenance of the HVAC equipment as was stated in Pro Mech letter of July 11, 2002.

b. Based on the above and in accordance with FAR Part 46 ( Government Acceptance of Services) specifically paragraph 46.407 "Non Conforming Supplies or Services" VAMC is withholding payment of all monies for not adhering to the contract specifications. Withholding of payments does not represent the VAMC attempt to cause unnecessary financial burden to Pro-Mech. If contract requirements were met, then VAMC has a legal obligation to pay for services rendered. However, when contract requirements have not been met, and sufficient time has been given to correct these deficiencies, VAMC has a legal obligation not to pay for these services.

c. As In accordance with FAR Part 49-4 it is the VAMC right to Terminate the Contract for Default based on ProMech actual and anticipated failure to perform its contractual obligations. Within 10 calendar days after receipt, Pro Mech must show cause why the contract should not be Terminated for Default. The failure of Pro Mech to present an explanation will be taken as an admission that no valid explanation exits.

Signed

Norbert J. Cebula
Contracting Officer