# Defendant's Exhibit 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

- - - - - - - - - - x

PRO-MECH USA, INC.,

Plaintiff,

-vs-

THE UNITED STATES,

Defendant.

- - - - - - - - - - x

No. 03-1673C
(Judge Braden)

Washington, D.C.

Thursday, August 19, 2004

Deposition of

THOMAS R. LOOS

a witness, called for examination by counsel on behalf of the Plaintiff, pursuant to notice, in the offices of The United States Department of Justice, Civil Division, 1100 L Street, Northwest, Washington, D.C., beginning at 12:33 p.m., before Daryl F. Garrett, a Verbatim Reporter and a Notary Public in and for the District of Columbia at Large, when there were present on behalf of the respective parties:

Whereupon,

THOMAS R. LOOS

a witness, was called for examination by counsel on behalf of the Plaintiff, and, after having been duly sworn by the Notary Public, was examined and testified, as follows:

EXAMINATION ON BEHALF OF PLAINTIFF

BY MR. TOLCHIN:

Q Will you state your full name, please?
A Thomas Raymond Loos.
Q Mr. Loos, are you employed?
A Yes.
Q By whom?
A The VA.
Q How long have you been employed there?
A Approximately three years, I guess.
Q What's your address, your employment address?
A 150 South Huntington Ave., Boston, Mass.
Q What's your home address?
A 47 Mears Ave., Quincy.
Q What do you do for the VA?
A At this time, I'm detailed to a project section as an engineering technician.
Q Prior to that detail, what was your position?

Q Mr. Willis was your boss?

A Yes.

Q Did you have any authority to decide if something was under the contract?

A No, none.

Q So you just went looked at a piece of equipment and said, Dan, this is what's happening and then he made a decision?

A Right. Especially if they had worked on it, you know. Let's say they had done a PM and the side panel is open or I couldn't get air through it and the filters were dirty and they're predated, you know, to the last contractor's initials, then, of course, we'd get right on the radio and try to get them to come rectify it.

Otherwise, if they wouldn't respond, then we would have to pull the filters, you know, change them ourselves and put the thing back together.

Q Did you find lots of instances in which that occurred, that Pro-Mech said that they had done a PM and you saw that it hadn't been done?

A It was -- it varied. It depended on if they had money, filters at the time. If they had the parts there and the filters, the job would get done. If they

didn't have the parts and the filters, you know, whether it was belts and filters, just saying PM or parts to repair something, it would get done, but if it -- if they didn't have it, it would be deferred for a long time.

We made up the slack, I and my counterpart, Kevin Dunston. He's the other -- he's licensed in the -- or has a technician license in the state of Mass.

Q So if they had the parts, they would do the PM? That's generally what you saw?

A Yeah. It took -- unfortunately it took -- I and Kevin had to spend a lot of extra -- I say spend a lot of extra effort into helping them, you know, find the machinery or making sure that they did the job correctly because it was mostly just the apprentices.

They didn't have any journeymen supervision really.

Q Mr. Cummins was there, wasn't he, at the beginning?

A You know, he was in and out. He was in and out running. He would show up sometimes like on a Monday or a Thursday probably, maybe two days a week, but he wasn't there day to day because he also ran between the Newport Naval Base and there. And he also had other

things going on in Lowell.

Q How about Mr. Smith; he was there every day?

A Mr. Smith was -- when he hired on, he was there every day until he went down to PA and was crowned the Northwest Regional Director for Pro-Mech. Then he started, because they had two contracts, he started going back and forth between Newport and the VA quite a bit.

So what it left was -- their interpretation was that, you know, their third year journeymen or whatever, Tyrus Pope could handle the job. Then when we pushed them to get a journeyman, they brought a Dan fellow up from --

Q McAndrews?

A Yeah. Up from -- that's Dave McAndrews; right?

Q Dave McAndrews, right.

A No. A Dan from -- up from Rhode Island and he had his Rhode Island ticket, but he didn't have a Massachusetts --

Q But he was qualified to do the work, wasn't he? He knew what he was doing?

A Actually, I saw him sit in the office and he didn't leave the office. It was questioned, you know,

what his experience is and what he could do.

I don't think he stayed long on the -- the guy that was really qualified, the one who -- two qualified, real qualified -- actually three qualified mechanics were Larry, if you can get him around, you know, but he held out for a while to get his pay up because they weren't paying him what they had promised, I guess, as with Richard Ludwich (ph.), too. He quit after two weeks because they didn't pay him what they were supposed to pay him.

Then there's Chowkowski (ph.), he had a grudge over his health benefits. He didn't take them. He had a letter stating that they would pay him like two dollars and some change an hour if he didn't take his health benefits. And I guess Marty Hannon wouldn't pay that, so he quit, but Chowkowski (ph.), very qualified, Dave McAndrews was very qualified, but didn't have any parts to do the job.

They had taken most of the tools, Tyrus Pope and Phil Smith and some other fellow, down to Newport to support that. So Dave was left up there. He's an excellent mechanic, but, you know, if we provided him the stuff he'd get it done.

Q That was like December, January, February time period?

A That was the very end of it.

Q Did he tell you that he didn't have the parts because the government wasn't paying?

A He just said he had to call and fax them the list of parts to Pro-Mech in Pennsylvania and if they provided them, he'd do it and that was it.

Q But did you know that the government wasn't paying for months?

A I really am not in you know, I didn't have time to sit and analyze this thing and didn't really care. My point was, did you send qualified mechanics, did you have qualified help here, apprentices.

Q So basically what you saw is that when they had the parts, they did the work, when they didn't have the parts, they didn't do the work?

A When they had the people on staff and they had parts, they could do the work.

Q How many instances did you actually see that you thought that they had indicated they had done a PM and they actually didn't; one or two?

A It wasn't one or two. It was about -- let's

say out of four, I might be able to get one right. They would leave equipment not put together, you know, the panel off it. They wouldn't change belts and what was odd is six months into the thing, we still had filters that were marked from Limbach Mechanical in the units, you know, and primarily -- it wasn't a real aggressive check.

It was because of my trouble calls, you know. We'd have to figure out why we weren't moving air in an office like this, you know, and go back to the source and figure out if it was a heating coil or a cooling coil.

Q I'm asking you whether you took a document that Pro-Mech said that they had done a PM on a piece of equipment and you went to that piece of equipment to spot check it and you saw that the PM had clearly not been done.

How many times did that actually occur?

A Well, I wasn't actually the inspector.

Q So it never occurred as far as you know? As far as you were concerned, it never occurred?

A As far as I'm concerned, every piece of equipment that I went to that was failed, you know, which I remember digging this information out when I filed my EEO case because I was running around so much for this.

It looked like it had never been worked on.

Q But you don't know what Pro-Mech had said about that piece of equipment? You don't have Pro-Mech's reports --

A I didn't have the privy of Pro-Mech's PM sheets, no. I had my own.

Q You had mentioned that you had -- you had your own PM sheets?

A I had for my own equipment, yeah.

Q You mentioned you have an EEO case?

A It's -- well, it's been done. I mean, it's been settled, ADR.

Q Who did you assert a claim against?

A Actually, it was, you know, my shop, Dan Willis and --

Q What did you assert?

A I'm a 30 percent disabled vet and I had an issue where, you know, my doctor had been saying for over a year that I was supposed to be like a desk job and not running around, miles and miles and ladders.

Q Did they give you that desk job ultimately?

A Yes. It took a while.

Q What is your disability?

A Physical, it's a right knee, right hip and right foot.

Q So to the extent that you could, you were trying to stick to the desk, so to speak?

A I would have loved to, but, you know, the problem is with the trouble Caller I was on the radio primarily, you know, 70 percent of the time. And that's how they get us, by Motorola. You have to respond to the calls. There's no other -- you know, you can't ignore.

Q Did you ever see Pro-Mech ignoring a call?

A There was a period where Pro-Mech wouldn't come out of the office, yes.

Q That was toward the end?

A I would say that's toward the end. At first, we had a pretty good working relationship. After Phil went down to Pennsylvania and came back, he wouldn't -- he would consult with his office and if they said no, he just sat. That's what I -- was how I felt about it.

Q When was that?

A That was actually going on. I don't know the exact dates.

Q Was it Christmas or after Christmas, after New Year, before New Year?

MR. COLT: Was it in the spring?

THE WITNESS: Yeah. It was actually --

BY MR. TOLCHIN:

Q The spring of 2003? The contract ran from October of 2002 through April of 2003.

A Yeah. I'm trying to think. I have to go back and consult notes when even Mr. Cummins -- it was right around November that Mr. Cummins passed away, the middle of November, somewhere around Thanksgiving.

So Phil waited for his -- for his crowning, but he basically didn't do anything until he went down to Pennsylvania. So he didn't do anything from mid-November till he went to Pennsylvania. I can't remember when he went down. It was like four weeks after Larry passed away and --

Q So he didn't do anything, he didn't fix anything?

A Well, his opinion was that he was holding out -- he was holding out like Larry did. He was waiting for Marty Hannon to get back to him.

Q So he didn't fix any equipment?

A He just went up and looked at stuff and he'd go back and sit down. He sat in the office, you know.

Q Who was doing PM work?

A Primarily Tyrus Pope and -- I don't know. I think it was Steve.

Q Were they qualified to do PM work?

A I wouldn't let Steve work on my -- I wouldn't let Steve work on anything, but Tyrus Pope, he was actually going to school at the time at Bay State Appliance & Refrigeration.

Q So he was qualified to do the PM work?

A I would say he was a decent mechanic, but he needed to be managed, he needed to be oversaw by somebody. I had an incident where I went to check a trouble call and it was an evacuation fan for research.

That evacuation fan evacuates a basement room that is a nitrogen cryogenic lab. And if the nitrogen tank overflows or a pipe breaks, all the lab assistants in there would be dead within minutes.

I went up on the roof to check the fan, took the fan housing off and half the shiv was on the roof, the other half was missing and the belt was gone to the motor. So I go, "Geez, the motor was running."

I had actually remembered seeing that half of the shiv on their tool cart and I go, "Geez, that's odd."

And I went down and talked to them about it and he said, "Oh, yeah, geez, we forgot to tell you that we had done that PM." It was approximately 30 days previously and I got the shiv, took them up, shut everything down, and I don't even think they had a journeyman around that day.

I showed them what to do and we repaired it and they took care of it and everything was cool. But, unfortunately, what was on the PM sheet was that they had serviced it and ~~it~~ said it was operational.

Q Was this a pulley that they --

A Yeah. It's an adjustable pulley.

Q In fact, they said that they found that pulley laying on that roof?

A Yeah. They had found -- they had found this thing apart and they took the parts down. And I don't know if they talked to their boss or what happened, but they had forgotten to put the thing back together and --

Q Well, actually, they didn't put it back together because they said they never took it apart. They just had been up there working on another piece of equipment and found this sitting there; isn't that right?

A No. They had -- the thing is when PMs come out, especially with fans, they have to be done all in one

day because we have to shut all of them down. You can't be on the roof, on that particular roof, unless you shut all the fans down and service them, but they didn't know what that piece was.

Q Because they hadn't been working on that fan?

MR. COLT: Objection. There's no reason to know why.

THE WITNESS: Yeah.

BY MR. TOLCHIN:

Q So they told you they didn't know where that piece was from?

A Yeah. They just didn't recognize what it was. It was half of a pulley.

Q So it's not that they took it apart and never finished it, they just found this thing laying there?

A What I mean by taking it apart and not finishing it, is they had to take the fan cover housing off to inspect, to see if the belt was on there and the belt was, of course, laying on the roof, probably half the pulley and --

Q But you don't know that?

A No, but the other half of the pulley and the belt was, you know, not taken off the roof.

Q You're surmising? All you saw was the pulley sitting there, is that piece of a pulley, which they told you they found --

A Well, one half of the pulley is in the basement building one and the other half of the pulley is on the machine. So somebody had to physically take that pulley --

Q But you don't know who did that, do you?

A No, I don't. I didn't physically watch --

Q It could have been Pro-Mech or it could have been somebody else?

A But I tell you, both of them admitted it and we took care of it and --

Q It could have been Pro-Mech, it could have been somebody else?

A Well, I suppose it could have been.

Q Did Pro-Mech ever tell you that they were refusing to do work?

A Yes.

Q Who told you that?

A Phil Smith.

Q What did he tell you?

A And Tyrus Pope was instructed by Phil Smith to

tell us --

Q What did they refuse to do?

A We had trouble calls they refused to respond to. We had PMs we needed done that they refused to do.

Q That was towards the end of the contract?

A Yeah, I think so.

MR. TOLCHIN: I have no further questions of this witness.

EXAMINATION ON BEHALF OF DEFENDANT

BY MR. COLT:

Q Mr. Loos, just a few questions.

Did you write any report out or do any documentation about this incident with the cryogenic tank, the pulley and the shiv?

A Well, I may have made a work order on this.

Q Do you recall or have any document that you remember at this time?

A That particular thing, I probably would not have made -- I would have made a report to my boss and he would have handled it.

Q You said it was toward the end of the contract that Mr. Smith and Mr. Pope were refusing to perform.

What months do you recall that this was?