# Defendant's Exhibit 7

Coll, 5



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

- - - - - - - - - - x

PRO-MECH USA, INC.,

Plaintiff,

-vs-

THE UNITED STATES,

Defendant.

- - - - - - - - - - x

No. 03-1673C
(Judge Braden)

Washington, D.C.

Thursday, August 19, 2004

Deposition of

JOSEPH E. HOFFMAN, JR.

a witness, called for examination by counsel on behalf of the Plaintiff, pursuant to notice, in the offices of The United States Department of Justice, Civil Division, 1100 L Street, Northwest, Washington, D.C., beginning at 11:17 a.m., before Daryl F. Garrett, a Verbatim Reporter and a Notary Public in and for the District of Columbia at Large, when there were present on behalf of the respective parties:



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
CB

P R O C E E D I N G S

MR. COLT: For the record, government counsel, Jim Colt. I'll see if we can turn over the, if they have the documents, Links proposal and if I can turn them over.

Whereupon,

JOSEPH E. HOFFMAN, JR.

a witness, was called for examination by counsel on behalf of the Plaintiff, and, after having been duly sworn by the Notary Public, was examined and testified, as follows:

EXAMINATION ON BEHALF OF PLAINTIFF

BY MR. TOLCHIN:

Q Can you state your full name?
A Joseph E. Hoffman, Jr.
Q Your business address?
A Boston VA Medical Center, 150 South Huntington Avenue, Boston, Massachusetts, 02130.
Q Your home address, please?
A 304 New London Avenue, West Warwick, Rhode Island, 02983.
Q Are you employed at Jamaica Plain?
A Yes, I am.
Q What do you do there?
A I'm the engineering manager.

A I do not know specifically.

Q Were you involved in issuing any notices to Pro-Mech about --

A None whatsoever.

Q Did you advise Mr. Cebula to pay or not to pay Pro-Mech?

A No, I did not.

Q Did you advise Mr. Cebula to default or not default Pro-Mech or to issue a cure notice or not issue a cure notice?

A I do not remember specifically whether I told him to issue a cure notice, but I don't think that I did.

Q That was something that was outside of your realm?

A Normally, it would be outside of my area of concern.

Q Did you see any of the work that Pro-Mech did?

A Please define what you mean.

Q Did you actually put your hands on, review, see, any work Pro-Mech did?

A I saw some results of some of the work that Pro-Mech is alleged to have done. I did not see them do it specifically, but I did see a result of a fire

situation in one of our machine rooms on the fourth floor. I do remember putting the fire out myself.

Q You were told by Mr. Willis that Pro-Mech had mis-wired that piece of equipment?

A I was informed that it had been mis-wired. I did look at the motor while I was putting the fire out, it took a CO2 extinguisher. It was coated with grease on the end bells (ph.). It seemed to me it was over greased, cutting down air circulation, which could increase overheating.

In addition to that, I did take a look at the contacts that were in the control panel that were feeding that particular unit. They were heat stressed, discolored because of heat.

In addition to that, there was a short section of burned wiring, burned from the fact that the insulation had been burned off. Again, a sign of severe overheating, but I did not see anyone wire that particular set of contacts and --

Q Did somebody tell you that Pro-Mech did?

A I was advised that Pro-Mech had made some changes to the wiring.

Q Who advised you of that?

A It was either Mr. Loos or Mr. Willis, one or the other.
Q Did you ever follow up on that information?
A As much as I could.
Q What did you do?
A I basically took a very good look at it myself and tried to determine what the particular problem might have been.
Q Did you make a determination that it had something to do with wiring?
A Well, part of it looked like it had been due to wiring. And in addition to that, it looked like the overloads had been cut out of the circuit.
Q Do you know who would have cut the overloads out?
A I did not know. All I had heard is hearsay. I did not see anybody do that.
Q Did Mr. Willis or Mr. Loos tell you that Pro-Mech had cut the overloads out?
A They had stated that, yes, but I cannot --
Q Did you ask them how they knew that?
A No, I did not.
MR. TOLCHIN: I have no further questions of

# Defendant's Exhibit 8

THE LAW OFFICES OF
ROBERT P. MEINGOSSNER
527 SWEDE STREET
NORRISTOWN, PENNSYLVANIA 19401

NEW JERSEY OFFICE:
1211 COLLINS AVE
COLLINGSWOOD, NJ 08107

TELEPHONE: (610) 279-1200
FACSIMILE: (610) 279-1245
EMAIL: bob@meingossner.com

December 5, 2002

Martin Hannon, President
Pro-Mech USA , Inc.
122 Railroad Drive
Ivyland, PA 18974

Re: **RFP 523-117-02, HVAC Maintenance**

Dear Mr. Hannon:

Per your request, I took the opportunity to review the documents related to the contract referred to above. Specifically, you requested my interpretation as to whether the contractor is required to repair or replace system components that were non-functional at the time the contract was executed.

Initially, I note that the contract is characterized as a contract for the "maintenance of building environmental and mechanical systems." Webster's defines "maintain" as "to keep in an *existing* state" or "to *keep* in a condition of good repair or efficiency". Therefore, it appears that the intent of the contract is to maintain the function of the system that existed at the time the contract was executed. It would not be the contractor's responsibly to upgrade the system above the performance that existed at the commencement date.

The terms of the contract itself support this interpretation. The contract presupposes three contract phases: testing, inspection and maintenance. *See,* Paragraphs 4 though 7. The contract defines what activities are included in the testing, inspection and preventative maintenance phases. Paragraph 7 requires the contactor to replace worn or doubtful components discovered during these phases.

If a worn or doubtful part exists prior to the contract commencement, such would not have been discovered through testing, inspection or maintenance. Rather, the Government presumably would be aware that the system was not functioning properly. Parts that failed prior to contract commencement are not within the contract's scope and are the responsibility of the prior contractor, if there was one, or the owner.

Paragraph eleven of the contract also provides that Pro-Mech is not responsible for misuse, abuse of the system, negligence of others (including the Government) failure of the

Government to properly operate the system, or other causes beyond the Contractor's control. One might argue that the failure to properly maintain the system constitutes negligence on the government's behalf. However, I believe that this is incidental to the contract; I believe this language is merely intended to support the fact that the contract is for "maintenance" only.

I trust this addresses your questions and concerns. If you have additional questions, please contact me directly.

Very truly yours,

Robert P. Meingossner